UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ROBERT E. BURNETT,                    )
                                      )
                    Plaintiff,        )
                                      )
          v.                          )          No.  1:05CV87 TIA
                                      )
JO ANNE B. BARNHART, Commissioner     )
of Social Security,                   )
                                      )
                    Defendant.        )

**MEMORANDUM AND ORDER**
**OF UNITED STATES MAGISTRATE JUDGE**

          This cause is on appeal from an adverse ruling of the Social Security Administration.  The

parties consented to the jurisdiction of the undersigned pursuant to 28 U.S.C. § 636(c).

**I.        Procedural History**

          On October 28, 2003, Claimant Robert E. Burnett filed an application for Disability

Insurance Benefits pursuant to Title II of the Social Security Act, 42 U.S.C. §§ 401, et seq.  (Tr.

114-17).[1]  In the Disability Report Adult completed by Claimant on October 28, 2003, and filed in

conjunction with the application, Claimant stated that his disability began on December 5, 2001,

due to back injury and pain.  (Tr. 120-48).  On initial consideration, the Social Security

Administration denied Claimant's claims for benefits.  (Tr. 84-89).  Claimant requested a hearing

before an Administrative Law Judge ("ALJ").  (Tr. 94).  On July 1, 2004, a hearing was held

_____

          [1]"Tr." refers to the page of the administrative record filed by the defendant with its Answer
(Docket No. 14/filed September 13, 2005).

before an ALJ.  (Tr. 20-82).  Claimant testified and was represented by counsel.  (Id.).

Claimant's wife and a vocational expert also testified at the hearing.  (Tr. 62-71, 71-80).

Thereafter, on November 22, 2004, the ALJ issued a decision denying Claimant's claims for

benefits.  (Tr. 10-19).  On March 11, 2005, the Appeals Council found no basis for changing the

ALJ's decision and denied Claimant's request for review of the ALJ's decision.  (Tr. 6-9).  The

ALJ's determination thus stands as the final decision of the Commissioner.  42 U.S.C. § 405(g).

## II.    Evidence Before the ALJ

### A.  Hearing on July 1, 2004

#### 1.  Claimant's Testimony

At the hearing on July 1, 2004, Claimant testified in response to questions posed

by the ALJ and counsel.  (Tr. 27-62).  Claimant's date of birth is September 27, 1957, and at the

time of the hearing, Claimant was forty-six years of age.  (Tr. 27-28).  Claimant lives in Benton,

Missouri with his wife and fifteen-year old daughter.   (Tr. 28, 30).  Claimant's wife is employed

by Pizza Hut, and she is the only source of income for the household  (Tr. 28, 31).  Claimant

finished tenth grade and can read and write.  (Tr. 41).

Claimant last worked as an installer putting together heavy industrial trucks and a welder

at Wheeler Steel Works on December 5, 2001.  (Tr. 31).  In that job, Claimant had to lift hoist

boxes weighing one hundred twenty pounds.  (Tr. 31-32).  On a regular basis, Claimant lifted

from ten to seventy-five pounds throughout the day.  (Tr. 33).  Claimant injured his lower back

while helping a co-worker lift a hoist box on top of a truck frame.  (Tr. 33).  Claimant returned to

work for eight days in June, 2002, before he was laid off from the job.  (Tr. 34, 57).  Claimant

testified that he could not lift as needed for the job, and so Mike Wheeler explained that since

Claimant could no longer do the job, he would have to lay off Claimant. (Tr. 35). Claimant learned to weld on the job while working at Wheeler Steel Works. (Tr. 42). Claimant testified that he could no longer weld, because he could not crawl under the truck or twist his body in position to weld. (Tr. 35-36). His position also required frequent stooping and bending approximately four hours each day. (Tr. 39-40).

Before working at Wheeler Steel Works, Claimant worked at Burger King in Paducah, Kentucky as the general manager. (Tr. 36). Claimant assembled a crew and helped cook food. (Tr. 36). Claimant testified that in that position, he worked sixty hours a week on his feet without sitting down or changing positions frequently. (Tr. 39). The position required him to bend and stoop approximately four hours each day, but now the extreme pain in his back prevents him from bending. (Tr. 39-40). Sometimes he helped unload a truck and lifted forty-pound box of patties. (Tr. 37). Claimant testified that he frequently lifted five to ten pounds in that position, but he could not perform the job on a repetitive basis because his legs give out if he stands too long. Claimant testified that his legs give out and buckle two to three times a week. (Tr. 37-38). Claimant experiences numbness in his legs much of the time so he uses a cane to prevent himself from falling down. (Tr. 38). Claimant testified that he did not have problems with his legs buckling and numbness in his legs before his back injury on December 5, 2001. (Tr. 38).

Claimant worked as a forklift driver at Triangle in Saxton. (Tr. 40). Claimant testified that he could no longer do that position, because the job required him to get up and down from a forklift numerous times throughout the day. (Tr. 41). The job also required moving heavy coils of copper, boxes of copper, and crates by hand and placing them on the forklift. Claimant testified that he was no longer capable of pushing and pulling the weight required of the position

without experiencing back and leg pain.  (Tr. 41).

After his back injury, Claimant had physical therapy, injections, and surgery by Dr. Coyle, but none relieved his back pain.  (Tr. 33, 60).  After the surgery in February 2003, Claimant's back felt slightly better, but thereafter, the pain increased.  (Tr. 33-34).  Claimant testified that he could sit and work and manipulate things with his hands such as building a model car.  (Tr. 49-50).  Claimant testified that he could sit for ten to twenty minutes before having to change his position.  (Tr. 50).  An evaluating doctor indicated that he should not operate any electric or air powered tools, because the vibration from operating the tools is hard on the body.  (Tr. 59-60).  Claimant testified that he has not operated a power tool since his injury.  (Tr. 60).  Claimant testified that two doctors have apprised him that he has attained maximum medical improvement.  (Tr. 61).  Dr. Pewitt is Claimant's treating physician and a general practitioner, but does not treat Claimant's back problems except to prescribe pain medication.  (Tr. 62).

Claimant filed for benefits because of his back pain as a result of his injury.  (Tr. 42).  Claimant testified that he had surgery on his stomach to alleviate his acid reflux disease in 2000.  (Tr. 43).  Claimant experiences extreme heartburn even when he has not consumed food.  When he bends over, food comes back out of his stomach.  (Tr. 43).  Claimant takes over-the-counter acid reducers, ranitidine for his stomach problems, and Oxycontin twenty milligrams twice a day for his back pain.  (Tr. 43-44).  If he does not take Oxycontin every day, he cannot stand because of pain.  (Tr. 44).  Claimant also takes alprazolam, Rolaids, and a stool softener.  (Tr. 45).  Claimant testified that the pain in his back never goes away.  (Tr. 46).  Claimant testified that he can sit for ten to twenty minutes without standing up.  When sitting for a long period of time, Claimant relieves the back pain by moving around, lying down, or alternating between sitting,

standing, and lying down every ten to twenty minutes. (Tr. 46). Claimant testified that he cannot

stand at a bench or counter and work without sitting or lying down. (Tr. 47). Claimant testified

that he lies down fifteen times a day. (Tr. 46, 50-51). Claimant can go one hour without having

to lie down. (Tr. 51). Claimant cannot bend at the waist without experiencing pain. (Tr. 51).

Claimant can touch his knees and lift a gallon of milk. (Tr. 51-52).

Claimant has a history of panic attacks with recent reoccurrence of the attacks. (Tr. 53).

During a panic attack, Claimant's heart starts to beat fast to the point he thinks he is having a

heart attack, and he senses doom. (Tr. 53). In the last month, Claimant has had panic attacks

every day. (Tr. 54). The panic attack lasts five to ten minutes and is caused by stress. (Tr. 59).

Financial stress has caused Claimant's panic attacks to escalate. (Tr. 59).

At the hearing, Claimant admitted that he had not taken his pain medication, because he

wanted to comprehend the proceeding without being foggy. (Tr. 57). Claimant testified that the

pain medication helps alleviate the pain. (Tr. 57). Claimant testified that using a cane helps him

from falling, and so he started carrying a cane. (Tr. 58). Claimant cannot pick up a dollar bill

from the floor or squat down without experiencing extreme pain. (Tr. 58-59).

As to his daily activities, Claimant testified that he walks around the house and to the

mailbox, but he cannot walk more than two hundred feet. (Tr. 47). Claimant spends most of the

time at home watching television, reading, and sleeping. (Tr. 57-58). Claimant has problems

putting on his socks and shoes and so either his wife or daughter helps him. (Tr. 56). Claimant

testified that he does not do any housework or wash dishes or clothes because of the pain in his

back and legs. (Tr. 47-48). Claimant's back pain prevents him from sleeping more than one hour

to an hour and a half at one stretch. (Tr. 51). Claimant sleeps for a total of four hours a night and

about three hours during the day. (Tr. 56). Claimant used to enjoy working on race cars, camping, floating down the Current River, fishing, and attending his daughter's track and field games. (Tr. 48, 55). In the last year, Claimant went camping one or two times and slept in their travel trailer. (Tr. 48). Claimant cannot attend his daughter's track meets, because he cannot climb the bleachers. (Tr. 49). Claimant testified that he has a driver's license, but he drives once a week no more than four miles from his house. (Tr. 29-30). Claimant cannot drive farther without experiencing increased back pain and numbness in his left leg. (Tr. 30). When driving in reverse, Claimant uses the mirrors, because he cannot look over his shoulder. (Tr. 52). Claimant testified that he cannot climb stairs or ladders because of his back pain. (Tr. 36).

Claimant described his days as bad and worse days. (Tr. 52). On a bad day, Claimant wakes up around 7:00 and takes an Oxycontin thirty minutes later. Claimant testified that for about three hours he feels slightly better, but by the early afternoon, he takes another Oxycontin. (Tr. 52). On a worse day occurring twice a week, Claimant experiences extreme shooting pain in his legs like a pinched nerve. (Tr. 52-53). The pain medication provides no relief for that pain. (Tr. 53). No physical activity causes Claimant to experience pain, but the pain just starts out of the blue. (Tr. 53).

### 2. Monica Burnett

Monica Burnett, Claimant's wife of fifteen years, testified in response to questions posed by the ALJ and counsel. (Tr. 62-70). Ms. Burnett testified that she sees Claimant on a daily basis. (Tr. 63). Ms. Burnett is employed as a manager by Pizza Hut and works fifty to sixty hours a week. Ms. Burnett is the only source of income for the family. (Tr. 63).

After injuring his back in December of 2001, Ms. Burnett testified that Claimant no longer

helps around the house, participates in their daughter's activities, or attends family functions.  (Tr. 63-64).  Ms. Burnett testified that Claimant used to do all of the yard work, but he no longer does any yard work.  (Tr. 64).  During the day, Claimant reads, watches television and sleeps.  (Tr. 65).  Ms. Burnett explained how Claimant does not sleep through the night, but he gets up and down during the night.  Ms. Burnett assists Claimant sometimes with his shoes and pulling up his pants.  Ms. Burnett or her daughter prepares the family meals.  (Tr. 65).  Ms. Burnett testified that Claimant used to enjoy building race cars, fishing, camping, and doing yard work.  (Tr. 66). Ms. Burnett testified that Claimant has problems remembering what she told him.  (Tr. 66). When watching television, Ms. Burnett noted that Claimant has to change positions at least once. (Tr. 69).  During the day, Claimant frequently lies down.  (Tr. 69).  Ms. Burnett characterized her husband as an active individual who participated in outdoor activities before his injury.  (Tr. 69-70).

### 3. Testimony of Vocational Expert

Vocational Expert Gary Weimholt, M.S., CDMS,[2] classified Claimant's past relevant work as a metal fabricator and assembler occupation in terms of <u>Dictionary of Occupational Titles</u> at the first level of a skilled job with at least a medium physical demand level to possibly an upward and heavy physical demand level.  (Tr. 71-72).  Mr. Weimholt testified that Claimant also worked as a fast food manager with Burger King at the five to six skill level requiring medium or light exertional level and the ability to lift greater than twenty pounds at a time.  (Tr. 72-73).

The ALJ asked Mr. Weimholt to assume that

an individual Mr. Burnett's age, vocational and educational background.  Further

---

[2]"CDMS." is the abbreviation for a certified disability management specialist.  (Tr. 34).

assume perform at the light level with the following additional limitations. Has to
have the ability to sit down at least every 30 minutes, unable to lift from ground
level -- let me rephrase that -- no lifting from lower than table level. No climbing,
no use of vibrating tools, no uneven or slippery surfaces and no overhead lifting.
No previous work. Any other work such an individual could perform?

(Tr. 74). Mr. Weimholt opined that such an individual would be able to work some simple

cashiering jobs under title of cashier II in the DOT and such jobs are considered light and

unskilled. (Tr. 74-75). Mr. Weimholt further opined that there would be approximately 1,500 of

those cashiering jobs in the state economy matching the hypothetical, and 75,000 as a minimum

nationally. (Tr. 74). Mr. Weimholt opined that such an individual would also be able to work

some electronic assembly work, and there are approximately 1,000 positions in the state economy

and 50,000 in the national economy. (Tr. 75). Such positions are also light and unskilled. In

addition, based on the hypothetical, another light and unskilled job would hand packagers with

approximately 1,000 positions in the state economy and 50,000 in the national economy. (Tr.

75).

The ALJ asked Mr. Weimholt to assume that

a sedentary level of exertion as well a sit/stand option and the other limitations
remain the same. No lifting from below table level, no overhead lifting, no
climbing, no use of vibrating tools, no uneven or slippery surfaces.

(Tr. 75). Mr. Weimholt opined that such an individual would be able to work some packaging

jobs such as pharmaceutical packaging with approximately 1,000 positions in the state economy

and 50,000 in the national economy, and some electronic jobs related to semi-conductor assembly

with approximately 1,000 in the state economy and 50,000 nationally. (Tr. 75-76). Mr.

Weimholt agreed with the ALJ that none of the jobs discussed would allow one to lie down at

unannounced times during the day. (Tr. 76).

The ALJ then opined that a mild impairment would not affect the performance of such jobs, because the jobs were simple one or two-step jobs, not complex or detailed. (Tr. 76). With respect to a moderate impairment, Mr. Weimholt opined that such an individual could not perform the jobs discussed or any other job. (Tr. 77).

Next, counsel asked the vocational expert to assume that the individual "couldn't stand or sit for more than 30 minutes without changing his position every 30 minutes or so, can he do that under hypothetical #1. Could he perform those jobs you mentioned?" (Tr. 77). Mr. Weimholt opined that such individual could accomplish something on the job. Mr. Weimholt agreed that if an individual had to lie down at any time during the course of an eight-hour day, such individual could not perform the jobs set forth in either hypothetical. (Tr. 77).

Next, counsel asked the vocational expert to assume the individual could not bend or stoop. (Tr. 78). Mr. Weimholt opined that such jobs would require slight forward leaning and so an individual who could not bend or stoop could work in the jobs set forth in either hypothetical. Assuming that the individual could only lift from waist to shoulder level, Mr. Weimholt opined that such an individual could perform the jobs under hypothetical #1. (Tr. 78). Mr. Weimholt opined that an individual who needed to rest thirty to forty-five minutes two to three times a week could not perform the jobs under either hypothetical. (Tr. 79-80).

### 3. Open Record

At the end of the hearing, the ALJ inquired whether Claimant would like to have a psychiatric or psychological CE to supplement the record. (Tr. 80). After consulting with

counsel, Claimant agreed to submit the decision to the ALJ without additional examination.  (Tr. 81).

### 4.  Forms Completed by Claimant

In the Disability Report Adult, Claimant indicated that his conditions limit his ability to work, because he cannot stand or walk but for short periods of time due to the extreme pain.  (Tr. 121, 137).  Claimant opined that his reason for seeing Dr. Charles Pewitt was for prescribing pain medication.  (Tr. 140).

## III.  Medical Records[3]

Claimant received treatment at Jackson Medical Center for recurrent malaise, fatigue, hypertension, starting in 2000.  (Tr. 322-24).  The treating doctor prescribed various medications as treatment.  (Tr. 322-24).  In 2001, Claimant received treatment for hypertension, moderate malaise, fatigue, and panic attacks at Jackson Medical Center.  (Tr. 319-21).  The treating doctor prescribed medications and noted that Claimant's "[a]nxiety much better controlled with meds."  (Tr. 319).

On December 11, 2001, Dr. S. Gordon Jones evaluated Claimant on behalf of Workers Compensation for his back injury at work one week earlier.  (Tr. 172).  Claimant reported doing lifting with an uneven force and experiencing pain since then on the left lower lumbar area with some radiation into both legs.  Examination revealed decreased range of motion, tenderness in

---

[3]Records were submitted to and considered by the Appeals Council subsequent to the ALJ's adverse decision.  (Tr. 402-37).  The Court must consider these records in determining whether the ALJ's decision was supported by substantial evidence.  Frankl v. Shalala, 47 F.3d 935, 939 (8th Cir. 1995); Richmond v. Shalala, 23 F.3d 1441, 1444 (8th Cir. 1994).  For the sake of continuity, discussion of these records is incorporated with that of the records before the ALJ at the time of his decision.

lower lumbar area especially on the left at the lumbosacral junction, and inability to do straight leg raises. X-rays were unremarkable. Dr. Jones prescribed Soma, Naprosyn, and Lorcet Plus. (Tr. 172). In a follow-up visit, Claimant reported doing better but still sore on the left and having trouble moving around. (Tr. 171). Claimant reported not working because of his inability to perform his regular duties. Examination revealed tenderness in the lower lumbar area at the lumbosacral junction on the left and diminished range of motion. Dr. Jones found Claimant to have lumbar strain, slightly improved. Dr. Jones prescribed Relafen and Soma. (Tr. 171). On December 27, 2001, Claimant returned for treatment of his lumbar strain. (Tr. 170). Claimant reported not doing much better. After examining Claimant, Dr. Jones ordered physical therapy as treatment and ordered him to continue light duty at work. (Tr. 170).

In the new patient evaluation at Mid America Rehab on December 28, 2001, Craig Brown, the physical therapist, noted that Claimant would be treated Claimant three times a week. (Tr. 315). In the initial evaluation, Claimant reported not returning to work since December 11, 2001, because his employer could not accommodate light restrictions imposed by his doctor. (Tr. 313). Claimant reported pain increasing with extended sitting, standing, and recumbent positions. Mr. Brown noted that Claimant has signs/symptoms of lumbar strain with concurrent pelvic asymmetry and likely SIJ dysfunction. (Tr. 314). Mr. Brown opined that Claimant exhibited good rehabilitation potential. (Tr. 314). Claimant returned for physical therapy treatment sessions on December 31, 2001 and January 2, 4, 7, 9, and 11, 2002. (Tr. 303-12). Mr. Brown noted that Claimant's pain is now occasional mild pain with improvement in lumbar flexion and extension. (Tr. 303).

In a follow-up visit on January 3, 2002, with Dr. Jones, Claimant reported doing much

better but still having pain on the left. (Tr. 169). Examination revealed improvement in Claimant's range of motion and some tenderness in the left lower lumbar area to palpation. Dr. Jones noted that Claimant's gait to be improving. Dr. Jones ordered Claimant to continue physical therapy and light duty at work. (Tr. 169). On January 15, 2002, Claimant reported his overall pain had improved but still experiencing some point tenderness around his left lumbosacral joint. (Tr. 168). Examination revealed improvement in Claimant's range of motion and movement. (Tr. 168). Dr. Jones ordered Claimant to continue physical therapy and switched Claimant to some work hardening to see if Claimant's symptoms could further improve. (Tr. 168). In a return visit on January 22, 2002, Claimant reported he felt like he might have been improving with work hardening until the day before when he did four hours and experienced some significant pain in his back. (Tr. 167). Examination revealed a decreased range of motion and tenderness in lower lumbar area on the left to palpation. Dr. Jones referred Claimant to an orthopedist for evaluation and refilled his Lorcet Plus prescription and continued Claimant on light duty. (Tr. 167).

On January 17, 2002, Claimant returned to Mid America Rehab for a trial evaluation of work hardening. (Tr. 299-302). Mr. Brown noted that Claimant had participated in conservative physical therapy management with good results. (Tr. 299). Although Claimant had been released with restrictions on lifting, and no bending, stooping, or twisting, he had not returned to work because his employer was unable to accommodate the restrictions. (Tr. 299). In the assessment plan for treatment, Mr. Brown indicated that Claimant would complete daily work hardening as ordered by his physician, Dr. Jones. (Tr. 301). Claimant returned for treatment on January 18, 21, and 22, 2002, for work hardening physical therapy treatment. (Tr. 294-98). In the Work

Hardening Progress Report dated January 22, 2002, Mr. Brown recommended that Claimant not continue work hardening at that time secondary to marginal functional improvements, but continue conservative physical therapy inasmuch as Claimant appeared to make more substantial gains. (Tr. 292-93).

On referral from Dr. Jones and workers compensation, Dr. William Kapp, an orthopedist, evaluated Claimant on January 25, 2002. (Tr. 173). Claimant reported being injured on December 5, 2001, while helping a coworker lift a hoist box onto a truck frame while working at Wheeler Steel Works. Physical therapy provided little relief. Examination revealed obvious abnormal posture, point tender over the SI joint on the left lower lumbar segment, and decreased motor strength on the left leg. Dr. Kapp noted that the x-ray of Claimant's lumbar spine was unremarkable and ruled out disc herniation of lumbar spine. Dr. Kapp ordered an MRI of Claimant's lumbar spine and ordered Claimant to remain off work until the MRI could be arranged. (Tr. 173).

The MRI of January 31, 2002, revealed reduction in the disc signal intensity at L4-L5 and L5-S1 and slight narrowing of the L4-L5 interspace and right lateral disc protrusion at L4-L5. (Tr. 178-80).

In a follow-up visit on February 5, 2002, Dr. Kapp discussed the MRI results with Claimant. (Tr. 174). The MRI revealed a degenerative signal at 4-5 and a decrease in the interspace and a questionable right lateral focal disc protrusion and decreased signal and intensity at 5-1. Dr. Kapp prescribed a lumbar epidural steroid injection and Flexeril and Voltaren and ordered Claimant to remain off work. On February 6, 2002, Dr. Kapp administered a lumbar epidural steroid injection. (Tr. 174). In a follow up visit on February 19, 2002, Claimant

- 13 -

reported some improvement in pain and range of motion.  (Tr. 175).  Dr. Kapp ordered lumbar stabilization exercises and to return to work, sedentary duty only.  (Tr. 175).

As prescribed by Dr. Kapp, Claimant returned to Mid America Rehab on February 22, 2002, for lumbar stabilization physical therapy program three times a week for three weeks.  (Tr. 291).  In the Objective, Amber Puttcamp, the physical therapist, noted how Claimant ambulated into the department and did not appear to be in acute distress.  (Tr. 290).  In the assessment, Ms. Puttcamp opined that Claimant's rehab potential is good for his symptoms of lumbar disc dysfunction.  (Tr. 290).  Claimant returned on February 25 and 27 and March 1 and 4, 2002, for treatment.  (Tr. 285-89).  Claimant reported doing better until he recently had to return to work light duty.  (Tr. 289).  Claimant noted how he thought he had done too much causing his lower back pain to increase.  Ms. Puttcamp opined that Claimant is progressing slowly towards goals.  (Tr. 285).  In follow-up visits on March 6, 8, and 11, 2002, Claimant reported a lot of pain in the left side of his lower back.  (Tr. 281-84).  Ms. Puttcamp recommended holding therapy.  (Tr. 281).

In a follow-up visit on March 12, 2002, Claimant reported continued pain and no improvement in his lower back.  (Tr. 175).  Dr. Kapp indicated that he would schedule Claimant for a second opinion with Dr. Allan Gocio and ordered Claimant to remain off work.  (Tr. 175).  Dr. Kapp noted that Claimant's insurance company denied his referral to Dr. Gocio, because Claimant has already been scheduled an appointment with another neurologist.  (Tr. 176).

The MRI of April 2, 2002, of Claimant's lumbar spine revealed right lateral L4-5 disc herniation and facet joint hypertrophy at L5-S1 level.  (Tr. 181).  On April 2, 2002, Dr. Coyle evaluated Claimant's back and bilateral lower extremity pain on referral by Healthlink.  (Tr. 344-

45). Claimant reported continued constant pain aggravated by twisting or standing. (Tr. 344).

Examination revealed compensatory shift of Claimant's back toward the right side. (Tr. 345).

Dr. Coyle reviewed Claimant's lumbar MRI and noted evidence of a right-sided extraforaminal

disc protrusion at L4-5. Dr. Coyle opined that Claimant's work-related activities appeared to be a

substantial contributing factor to his current symptoms. Dr. Coyle noted that the current MRI

does not adequately explain the left-sided radiculopathy symptoms Claimant has inasmuch as the

MRI shows no evidence of abnormalities on Claimant's left side. (Tr. 345). The MRI of

Claimant's lumbar spine revealed normal alignment. (Tr. 356).

     In a letter dated April 3, 2002, Dr. James Coyle reported to a claims representative at

Healthlink how Claimant stopped by his office and reported continued left lower extremity pain.

(Tr. 343). Dr. Coyle reviewed an MRI with Claimant and explained how the MRI revealed no

evidence of a disc herniation on the left side. Dr. Coyle shared with Claimant what he discussed

with the claims representative regarding Claimant seeing a psychiatrist to supervise rehabilitation.

Dr. Coyle concluded by noting that Claimant has a good prognosis for improvement from the

injury without surgery. (Tr. 343).

     On April 17, 2002, Claimant returned to Mid America Rehab for treatment for three

weeks. (Tr. 280). In the initial evaluation, the physical therapist noted that Claimant's treatment

would include abdominal stabilization, stretching, and MFR/massage. (Tr. 279). Claimant

returned for treatment on April 19, 22, 24, and 26, 2002, and reported improvement and no more

numbness or tingling into his legs. (Tr. 274-78).

     In a follow-up visit on April 29, 2002, Ms. Puttcamp recommended that Claimant start

work hardening and conditioning. (Tr. 268-69, 272). Dr. Tate approved the recommendation on

May 1, 2002.  (Tr. 268-69, 272).  Claimant returned on May 3 and 6, 2002, for work hardening

treatments.  (Tr. 264-67, 271).  Mr. Brown noted that Claimant demonstrated function in the

medium work demand level, but his job at Wheeler Steel Works is one in the heavy work demand

level.  (Tr. 265).  Mr. Brown opined that the main limiting factors for Claimant's successful return

to work are decreased lifting capacity, decreased tolerance to bending and climbing, and

subjective complaints of pain.  (Tr. 265).  Claimant returned for work hardening conditioning

treatment on May 7, 8, 9, and 10, 2002, at Mid America Rehab.  (Tr. 260-63).  On May 13, 2002,

Mr. Brown completed a functional capacity evaluation of Claimant.  (Tr. 253-59).  Mr. Brown

noted some inconsistencies in Claimant's efforts and some measure of symptom magnification

and/or inappropriate behaviors on the part of Claimant.  (Tr. 253).  Mr. Brown opined that

Claimant did not satisfy the full-duty essential job functions for his job at Wheeler Steel Works,

because he is limited in his ability to bend and kneel on a frequent basis.  Mr. Brown further noted

that Claimant appeared appropriate for employment in the heavy PDC level.  (Tr. 253).

On May 30 and 31 and June 3, 4, and 5, 2002, Claimant returned to Mid America Rehab

for work hardening treatments.  (Tr. 244-52).  Mr. Brown noted in the Progress Report dated

June 5, 2002, that Claimant demonstrates function in the heavy work demand level, and

Claimant's main limiting factors for successful return to work are decreased lifting capacity and

subjective complaints of pain.  (Tr. 245).  The job description provided by Wheeler Steel Works

including a lifting requirement of fifty to one hundred pounds, but Claimant was not meeting the

lifting requirement.  Mr. Brown opined that Claimant could static sit, stand, and kneel for thirty

minutes each.  Mr. Brown noted that Claimant's work hardening orders were complete, and he

would follow-up on the doctor's recommendations on June 10, 2002.  (Tr. 245).  On June 12,

2002, Claimant returned after Dr. Tate prescribed continued work hardening treatment for one more week. (Tr. 243). On June 13, 14, 17, and 18, 2002, Claimant returned for full-day work hardening treatment. (Tr. 238-43).

On November 11, 2002, Dr. John Krettek, a neurosurgeon, evaluated Claimant's severe low back pain and left lower extremity pain and numbness on request by Missouri Employers Mutual Insurance Company. (Tr. 187). Claimant reported returning to work at Wheeler Steel Works in June 2002 as a welder and assembler, but being unable to do his job because of back pain and being laid off. Claimant reported focal left low back pain radiating over his left lower extremity with increased pain radiating across the back with activity. Claimant reported not taking pain medications due to lack of medical insurance. (Tr. 187). Dr. Krettek observed that Claimant walked with a left limp, favoring the left lower extremity. (Tr. 189-90). Examination revealed lumbar flexion limited to forty-five degrees and extension limited to ten degrees with focal pain in the lower back. (Tr. 190). Straight-leg raising tests revealed no limitation on either side. Dr. Krettek noted that he had reviewed Claimant's extensive medical records including MRI scans, the medical records of Dr. Coyle, Dr. Tate, Dr. Jones, and Dr. Moore, and treatment records from Mid America Rehab and the pain clinic at Southeast Missouri State Hospital. (Tr. 190-91). Dr. Krettek opined that Claimant has a left L5-S1 facet dehiscence with focal facet pain and recommended a bone scan and a diagnostic facet injection of the left L5-S1 facet. (Tr. 191).

The total body scan of Claimant performed on November 21, 2002, revealed no abnormality in the lower lumbar spine to explain Claimant's facet type pain and degenerative changes in the acromioclavicular joints. (Tr. 186).

On December 10, 2002, Dr. Krettek administered a left L5-S1 facet joint injection. (Tr.

185).  Claimant tolerated the procedure well and experienced no complications.  (Tr. 185).  In a follow-up note dated December 19, 2002, Claimant reported that his pain had returned to its pre-injection level thus confirming Dr. Krettek's diagnosis of left L5-S1 facet anthropathy.  Dr. Krettek recommended Claimant have a L5-S1 fusion and see Dr. Michael Boland or Dr. Michael Polinsky for consideration of a lumbar fusion L5-S1.  (Tr. 184).

The MRI of January 7, 2003, of Claimant's lumbar spine revealed mild degenerative facet changes at L4-L5 and L5-S1.  (Tr. 182).

In a follow-up visit on February 5, 2003, Dr. Coyle noted that Claimant's recent MRI revealed degenerative disc disease at L5/S1 with desiccation of the disc and facet joint effusions at both levels.  (Tr. 341).  Examination revealed significant back pain aggravated by hyperextension and left lateral bending.  Dr. Coyle opined that Claimant has significant inflammatory component to his symptoms.  (Tr. 341).  Based on the relief Claimant received from the facet injection and his examination, Dr. Coyle decided to perform a L5/S1 fusion.  (Tr. 342).  Dr. Coyle noted that Claimant understood that he would not be able to work "in the very heavy capacity following the lumbar fusion at L5/S1."  (Tr. 342).  The MRI of Claimant's lumbar spine revealed mild degenerative with anterior hypertrophic spurring.  (Tr. 355).

On February 24, 2003, Dr. James Coyle admitted Claimant to St. John's Mercy Medical Center for elective lumbar decompression and instrumented fusion L5-S1 under general anesthesia as treatment of his facet dehiscence L5-S1.  (Tr. 192).  The preoperative MRI scans of Claimant's lumbar spine revealed a radiopaque marker posterior to the L5 disc space and internal spinal fixation with transpedicular screws bridging L5-S1.  (Tr. 203-04).  Dr. Coyle noted that Claimant had received conservative treatment including facet injections for his intractable back and left

lower extremity symptoms of pain. (Tr. 193). Review of Claimant's lumbar MRI scans revealed evidence of right-sided foraminal protrusion at L4-5 and marked facet arthritis at L5-S1 on the left side with a joint effusion. (Tr. 193). In the operative note, Dr. Coyle set forth the surgical procedure, lumbar decompression L5-S1 bilaterally with posterolateral fusion and posterior fusion using iliac crest structural bone graft, segmental pedicle screw fixation system and Brantigan interbody fusion cages to be performed under general anesthesia. (Tr. 205). Dr. Coyle noted that Claimant tolerated the surgical procedure well. (Tr. 206). The MRI performed on February 27, 2003, status post lumbar laminectomy and fusion revealed the fusion by means of Steffee type plates and transpedical screws remain in good position without change, and satisfactory alignment is maintained. (Tr. 197). On February 28, 2003, postoperative day four, Claimant was discharged in stable condition. (Tr. 192).

In a status post lumbar decompression and fusion L5-S1 surgical follow-up note dated March 18, 2003, Claimant reported that his main symptoms of pain on the left side of his lower back were gone. (Tr. 339). Claimant had no complaints of numbness or tingling in his legs and reported overall doing well. (Tr. 339). Dr. Coyle decided to prescribe physical therapy and refilled Claimant's Vicodin prescription. (Tr. 338-39). The MRI of Claimant's lumbar spine showed the presence of a laminectomy defect. (Tr. 354).

On April 4, 2003, Claimant returned to Mid America Rehab for treatment including lumbar stabilization, strengthening, stretching, and conditioning after recent lumbar fusion surgery. (Tr. 235-37). Ms. Puttcamp noted that Claimant ambulated into the department and did not appear in acute distress and opined that Claimant's rehab potential was good. (Tr. 235). Claimant returned for treatment on April 7, 9, and 11, 2003. (Tr. 231-34). In the Progress Note

dated April 11, 2003, Ms. Puttcamp noted that Claimant's endurance was increasing. (Tr. 231). Claimant returned for treatment on April 14, 16, and 17, 2003. (Tr. 227-30). Claimant reported feeling stronger, but still experiencing soreness in his lower back. (Tr. 227). Ms. Puttcamp noted the Claimant's strength and endurance continued to increase. (Tr. 227). In the follow-up treatment sessions on April 21, 23, 25, and 28, 2003, Claimant reported continued soreness and stiffness in his back. (Tr. 222-26). In the Progress Note dated April 28, 2003, Ms. Puttcamp noted that Claimant ambulated with a normal gait and did not appear in acute distress. (Tr. 222).

On April 29, 2003, Claimant reported a fifty percent improvement after surgery during a follow-up visit with Dr. Coyle. (Tr. 337). Claimant reported localized back pain but no radiating pain down his left lower extremity. Claimant reported walking at least a mile every day, and Dr. Coyle advised him to walk on a regular basis. Dr. Coyle noted that Claimant was unable to work at that time. (Tr. 337). The MRI of Claimant's lumbar spine showed internal spinal fixation plates bridging L5-S1 and no change in alignment. (Tr. 353).

In follow-up treatment sessions on May 5, 7, 9, 13, 14, and 16, 2003, Claimant reported decline in function with corresponding complaints of soreness. (Tr. 214-21). In the Progress Report dated May 16, 2003, Ms. Puttcamp noted that Claimant has made improvements in his range of motion, but has continued soreness and muscle spasms. (Tr. 214). In the treatment sessions on May 19, 20, , 22, 27, 28, and 30, 2003, Ms. Puttcamp noted that Claimant has achieved slow progress overall. (Tr. 207-13).

On June 25, 2003, Claimant reported improvement, but complained of left-sided SI joint pain and questioned whether physical therapy helped or not. (Tr. 336). Dr. Coyle prescribed Vioxx and Elavil and encouraged Claimant to do physical therapy exercises at home. (Tr. 336).

The MRI of Claimant's lumbar spine showed internal fixation L5-S1 and no change. (Tr. 352).

In a follow-up visit on August 6, 2003, Claimant reported not taking any pain medication and feeling good so long as he does not exert himself. (Tr. 335). Claimant further reported not having a lot of back pain and walking a mile on a regular basis. Based on his examination and the x-rays, Dr. Coyle found Claimant capable of light duty work with no repetitive bending at the waist and no lifting more than twenty pounds. Dr. Coyle placed a permanent lifting restriction of thirty pounds and no repetitive bending at the waist of greater than forty degrees based on Claimant's fusion. (Tr. 335). The MRI of August 6, 2003, of Claimant's lumbar spine revealed little change from the June 25, 2003, study, and the upper spine appeared normal. (Tr. 351).

In a follow-up visit on September 17, 2003, Claimant reported residual back pain with activity. (Tr. 334). Dr. Coyle noted the restrictions imposed during the last visit and opined "[i]f there is any question about refining his work restrictions with respect to any specific job, a functional capacity evaluation would be indicated." (Tr. 334). The MRI of September 17, 2003, of Claimant's lumbar spine revealed alignment maintained and bilateral laminectomy defects at L5. (Tr. 350).

On September 30, 2003, Claimant returned to Jackson Medical Center for evaluation of his back pain. (Tr. 317). Claimant reported being released two weeks earlier by a St. Louis based worker's compensation physician for back pain. Claimant reported chronic pain and having been given a thirty pound weight restriction and a limitation on bending in excess of forty degrees. Claimant reported having tried Vioxx, Celebrex, Vicodin, Percocet, and Lorcet. The doctor prescribed Oxycontin. In a follow-up visit on October 10, 2003, Claimant reported significant improvement with his back pain but occasional nausea and vomiting as result of the medication.

The doctor prescribed Protonix to resolve Claimant's nausea and vomiting. Claimant returned on October 15, 2003, and reported feeling much better overall. Examination revealed Claimant to be ambulating much better and in less pain overall. The doctor refilled the Oxycontin prescription. (Tr. 317).

In a report dated October 21, 2003, Chuck Stapinski, an OTR/L at ProRehab, completed a functional capacity evaluation to determine the feasibility for Claimant to return to work as an uplifter (mechanic). (Tr. 325-31). Mr. Stapinski opined that during the evaluation Claimant put forth a fair effort. In particular, he noted "[h]owever, despite thorough explanation of evaluation criteria, subjective complaints are out of proportion with displayed function and the worker failed 7/13 validity criteria indicating inconsistent effort/positive non-organic signs." (Tr. 325). Mr. Stapinski cited as the main limiting factor for successful return to work possible symptom magnification and thus an inability to accurately identify abilities and limitations accurately. Mr. Stapinski concluded that Claimant did not appear to be an appropriate rehabilitation candidate and deferred to the physician's final disposition after review of the evaluation and other relevant medical findings. (Tr. 325). Mr. Stapinski noted that Claimant displayed no significant change in quality of movements. (Tr. 326).

In a follow-up visit on October 27, 2003, Dr. Coyle noted that Claimant reported a new onset of bilateral lower extremity pain on the outside of his knees. (Tr. 333). Dr. Coyle noted that Claimant reported seeing a personal physician who had prescribed Oxycontin twice a day. Dr. Coyle ordered an MRI. In the Addendum, Dr. Coyle noted how Claimant's functional capacity evaluation was obtained and reviewed, and the evaluator believed Claimant's subjective complaints were out of proportion with his displayed function as demonstrated by inconsistent

effort/positive non-organic signs. The evaluator was not able to provide a work description, because he felt he could not accurately identify Claimant's abilities and limitations. (Tr. 333). The MRI of October 27, 2003, of Claimant's lumbar spine revealed no change since September 17, 2003. (Tr. 349).

The MRI of October 31, 2003, of Claimant's lumbar spine revealed wide laminectormy present at L5-S1 associated with two intervertebral disk cages and titanium fusion hardware at L5 and S1, no associated disk herniation, and slight facet hypertrophic change noted at L4-5 without juxtafusional stenosis. (Tr. 346, 348).

On November 12, 2003, Dr. Charles Pewitt of the Jackson Medical Center, treated Claimant in a follow-up visit for his chronic back pain. (Tr. 390). Dr. Pewitt noted that Claimant's Oxycontin medication seemed to control Claimant's pain. Examination revealed increased tenderness to palpation of the lower lumbar region. (Tr. 390).

In the Physical Residual Functional Capacity Assessment completed on November 21, 2003, Dana Taylor, a senior counselor, listed degenerative disc disease as Claimant's primary diagnosis. (Tr. 357). Ms. Taylor reviewed Claimant's medical records for the purpose of assessing Claimant's physical residual capacity. Ms. Taylor indicated that Claimant's exertional limitations included that Claimant could occasionally lift twenty pounds; could frequently lift ten pounds; could stand, walk or sit about six hours in an eight-hour work day; and was unlimited in pushing and pulling and lifting and/or carrying. (Tr. 358). In support of her conclusions, Ms. Taylor cited Claimant's MRI readings and x-rays and noted how Claimant's subjective complaints during the functional capacity evaluation were out of proportion with his displayed function. (Tr. 358-59). Ms. Taylor indicated that Claimant's postural limitations included that Claimant could

frequently climb, balance, kneel, and crawl and occasionally stoop or crouch due to the L5-S1 fusion. (Tr. 360). Ms. Taylor further indicated that Claimant had neither manipulative limitations nor visual limitations. (Tr. 361). With respect to communicative and environmental limitations, Ms. Taylor found none to be established. (Tr. 362). Ms. Taylor concluded that the severity of Claimant's impairment results in some limitations, but the objective evidence does not correlate to his subjective complaints thus finding Claimant's allegations to be considered partially credible. (Tr. 363). Ms. Taylor noted that the evidence on record shows Claimant is restricted to lifting no more than twenty pounds and no repetitive bending at the waist of greater than forty degrees. (Tr. 364).

In a return visit on December 10, 2003, with Dr. Pewitt, Claimant reported having a moderate amount of severe back pain with difficulty ambulating. (Tr. 390). Examination revealed significant pain with palpation of lower lumbar region. (Tr. 390). Dr. Pewitt refilled Claimant's Oxycontin prescription. (Tr. 390).

On January 2, 2004, Dr. Thomas Lee, an orthopedic surgeon, evaluated Claimant on referral by workers' compensation. (Tr. 385-87). Claimant's chief complaint was left sacral pain. (Tr. 385). Claimant reported taking Oxycontin two twice a day. (Tr. 385). Claimant reported doing some yard work. (Tr. 386). Examination revealed straight leg raise to be negative with no radicular pain. Dr. Lee noted as impression "[s]tatus post L5-S1 posterior spinal fusion and posterior lumbar interbody fusion." (Tr. 386). Dr. Lee opined that Claimant appears to have a solid fusion and a fourteen percent partial disability at the level of the whole body for his lumbar spine condition. (Tr. 387).

In a follow-up visit on January 29, 2004, with Dr. Pewitt, Claimant reported having

another MRI and the results showing nothing. (Tr. 389). Claimant reported significant pain and barely being able to walk and being out of Oxycontin. Examination revealed significant tenderness to palpation of the low lumbar region. Dr. Pewitt refilled Claimant's Oxycontin prescription and requested Claimant to bring a copy of the recent MRI. Claimant returned for treatment on March 9, 2004, and reported excruciating back pain. Dr. Pewitt refilled his Oxycontin prescription and requested Claimant to bring in a copy of his MRI report for evaluation. On April 6, 2004, Claimant returned and reported pain with radiation into the extremities. A review of the MRI report showed a normal report. Dr. Pewitt noted that Claimant ambulated with a limp. Dr. Pewitt prescribed Oxycontin. (Tr. 389). In a follow-up visit on June 1, 2004, Claimant reported seeing a specialist in St. Louis and believing the specialist could help his chronic back pain. (Tr. 388). Dr. Pewitt refilled his Oxycontin prescription and prescribed Xanax for his mild anxiety. (Tr. 388).

In the May 20, 2004, evaluation completed at the request of Claimant's counsel, Dr. Mark Lichtenfeld reviewed Claimant's medical records and examined Claimant. (Tr. 391-401). Claimant reported having throbbing pain in his lower back and his SI joints, numbness in his left leg two to three times a week, and middle back pain. (Tr. 398). Examination revealed an antalgic gait with Claimant placing most of his weight on his right foot. During the examination, Claimant changed positions while seated and alternated between sitting and standing with frequency. Examination revealed marked tenderness over the L4-5 and L5-S1 intervertebral spaces and tenderness over the left SI joint. (Tr. 398). Dr. Lichtenfeld found Claimant to have right L4-5 herniated nucleus pulposus, left L5-S1 bulging disc, acceleration of degenerative changes, chronic right lower back pain, left La5 and S1 radiculopathy, and chronic intractable pain. (Tr. 399). Dr.

Lichtenfeld opined that as a result of the December 5, 2001, workplace accident, Claimant has a 45% permanent partial disability of the person as a whole, and he needs further treatment including treatment by a pain specialist. (Tr. 399-400). Dr. Lichtenfeld further opined that Claimant's workplace restrictions include avoiding prolonged rides in motor vehicles, avoiding twisting, bending, stooping, and squatting, avoiding all lifting from the ground level to the waist level and from the shoulder level overhead, lifting only between the waist and shoulder level no more than twenty to twenty-five pounds at one time and no more than ten to fifteen pounds on a repetitive basis, avoiding ascending and descending stairs, operating powered tools, and walking on slippery or uneven surfaces. (Tr. 400). Dr. Lichtenfeld opined that Claimant's disabilities include a 32.5% permanent partial disability of the right knee and a 27.5% permanent partial disability of the person as a whole due to his chronic gastroesophageal reflux disease. Dr. Lichtenfeld opined that in combination, Claimant's disabilities create a significant obstacle and/or hindrance to Claimant's ability to obtain employment. (Tr. 400). Dr. Lichtenfeld determined that Claimant was never capable of returning to his full job duties at Wheeler Steel Works, and Claimant is totally and permanently disabled as he is unable to compete on the open labor market. (Tr. 401).[4]

## IV.    The ALJ's Decision

The ALJ found that Claimant met the disability insured status requirements on December

---

[4]"A medical source opinion that an applicant is 'disabled' or 'unable to work' ... involves an issue reserved for the Commissioner and therefore is not the type of 'medical opinion' to which the Commissioner gives controlling weight." Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005), citing Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).

5, 2001, the date he alleged he became unable to work. (Tr. 18). The ALJ found that Claimant has not engaged in substantial gainful activity since the alleged onset date of disability. The ALJ found that the medical evidence establishes that Claimant has the severe impairment of back pain post surgery but that his anxiety is not a severe impairment. The ALJ found that Claimant's medically determinable impairment does not meet or equal one of the listed impairments set forth Appendix 1, Subpart P, Regulations No. 4. The ALJ found that Claimant's subjective complaints are not credible. The ALJ further found that Claimant has the residual functional capacity for employment at the sedentary exertional level with a sit or stand option every 30 minutes, no overhead lifting, no walking on uneven surfaces, no climbing, no lifting from ground level, and no work around vibration. (Tr. 18). The ALJ determined that Claimant does not retain the RFC to perform his past relevant work. (Tr. 18-19). The ALJ noted that Claimant is a younger individual with a limited education and past relevant work as a metal fabricator and a fast food manager. (Tr. 19).

Considering Claimant's age, limited education, and residual functional capacity, the ALJ opined based on the vocational expert testimony that Claimant can perform a significant number of jobs in the national economy. (Tr. 19). The ALJ thus concluded that Claimant was not under a disability at any time through the date of his decision. (Tr. 19).

## V.     Discussion

In a disability insurance benefits case, the burden is on the claimant to prove that he or she has a disability. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). Under the Social Security Act, a disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A). Additionally, the claimant will be found to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).

The Commissioner has promulgated regulations outlining a five-step process to guide an ALJ in determining whether an individual is disabled. First, the ALJ must determine whether the individual is engaged in "substantial gainful activity." If she is, then she is not eligible for disability benefits. 20 C.F.R. § 404. 1520(b). If she is not, the ALJ must consider step two which asks whether the individual has a "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If the claimant is not found to have a severe impairment, she is not eligible for disability benefits. If the claimant is found to have a severe impairment the ALJ proceeds to step three in which he must determine whether the impairment meets or is equal to one determined by the Commissioner to be conclusively disabling. If the impairment is specifically listed or is equal to a listed impairment, the claimant will be found disabled. 20 C.F.R. § 404.1520(d). If the impairment is not listed or is not the equivalent of a listed impairment, the ALJ moves on to step four which asks whether the claimant is capable of doing past relevant work. If the claimant can still perform past work, she is not disabled. 20 C.F.R. § 404.1520(e). If the claimant cannot perform past work, the ALJ proceeds to step five in which the ALJ determines whether the claimant is capable of performing

other work in the national economy. In step five, the ALJ must consider the claimant's "age, education, and past work experience." Only if a claimant is found incapable of performing other work in the national economy will she be found disabled. 20 C.F.R. § 404.1520(f); see also Bowen, 482 U.S. at 140-41 (explaining five-step process).

Court review of an ALJ's disability determination is narrow; the ALJ's findings will be affirmed if they are supported by "substantial evidence on the record as a whole." Pearsall, 274 F.3d at 1217. Substantial evidence has been defined as "less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." Id. The court's review "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision, we also take into account whatever in the record fairly detracts from that decision." Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998). The Court will affirm the Commissioner's decision as long as there is substantial evidence in the record to support his findings, regardless of whether substantial evidence exists to support a different conclusion. Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).

In reviewing the Commissioner's decision, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The claimant's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The claimant's subjective complaints relating to
       exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the
       claimant's impairments.

6. The testimony of vocational experts when required which
   is based upon a proper hypothetical question which sets forth the claimant's
   impairment.

Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting

Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

To the extent that Claimant argues that the ALJ's decision is not supported by substantial

evidence on the record as a whole because the ALJ failed to properly evaluate the severity of his

impairments, in particular, his anxiety, the undersigned finds this argument to be without merit.

In his application for disability benefits, Claimant alleged disability due back injury. The

ALJ found Claimant's back pain post surgery to be a severe impairment and concluded that the

impairment is not of listing level. A review of Claimant's application shows that Claimant failed

to allege anxiety as a basis for disability. With respect to his anxiety, the record contains one

month of medical records addressing this alleged impairment. Based on the present record,

Claimant's anxiety could not meet the twelve-month durational requirement of the Act because

Claimant has not and cannot show his heart anxiety has lasted for twelve months. See 20 C.F.R.

§ 404.1509 (impairment must last or be expected to last for continuous period of at least twelve

months).

The Court finds no support anywhere in the record for Claimant's contention that the ALJ

erred in failing to consider his anxiety as a severe impairment, and to determine its effect on his

limitations. First, Claimant never alleged that his anxiety was disabling, and he presented no

medical evidence substantiating such claim. Moreover, Claimant never alleged any limitation in

function as a result of his anxiety in his application for benefits or during the hearing. Indeed, the

medical record is devoid of any support. The record not only fails to contain substantial

evidence to support such a claim, it contains virtually no evidence to support Claimant's argument. The ALJ is under "no obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability." Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (quoting Brockman v. Sullivan, 987 F.2d 1344, 1348 (8th Cir. 1993)). Accordingly, this claim is without merit.

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in determining Claimant's RFC and erred in finding Claimant not disabled inasmuch as his decision is not supported by substantial evidence.

A.      ALJ's Residual Functional Capacity Assessment

Claimant claims that the ALJ improperly determined that Claimant could perform the light and unskilled cashier and electronic assembly jobs and sedentary level jobs. Residual functional capacity ("RFC") is what a claimant can do despite his limitations, and it must be determined on the basis of all the relevant evidence, including medical records, physicians' opinions, and claimant's descriptions of his limitations. See Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); 20 C.F.R. § 416.945(a).

At step three of the evaluation process the ALJ found that the Claimant has a severe impairment, but that the impairment does not meet or equal any listed impairment. At step four, the ALJ found that the Claimant is unable to perform his past relevant work. But, the ALJ found that the Claimant retains the residual functional capacity ("RFC") to perform the physical exertion and non-exertional requirements of some sedentary level work with a sit or stand option every thirty minutes except that he is restricted in overhead lifting, walking on uneven surfaces, climbing, lifting from ground level, and working around vibration. Thus, the ALJ determined that

the Claimant is able to perform sedentary work. <u>See</u> <u>Goff v. Barnhart</u>, 421 F.3d 785, 790, 794 (8th Cir. 2005) (if claimant cannot perform past work, Commissioner must prove claimant retains RFC to do other kinds of work existing in substantial numbers in national economy). Claimant contends that such determination by the ALJ was erroneous, arguing only that such finding runs counter to Mr. Weimholt's testimony that Claimant would not be able to perform light and unskilled jobs and sedentary jobs if Claimant had to rest for thirty to forty-five minutes before returning to a standing position or had to lie down during the course of an eight-hour day.[5]

"The ALJ must determine a claimant's RFC based on all of the relevant evidence." <u>Fredrickson v. Barnhart</u>, 359 F.3d 972, 976 (8th Cir. 2004). It is the responsibility of the ALJ to assess a claimant's RFC based on all the evidence, including medical records, the opinions of treating and examining physicians, as well as the claimant's own statements regarding his limitations. <u>McGeorge v. Barnhart</u>, 321 F.3d 766, 768 (8th Cir. 2003); <u>McKinney v. Apfel</u>, 228 F.3d 860 863 (8th Cir. 2000) (citing <u>Anderson v. Shalala</u>, 51 F.3d 777, 779 (8th Cir. 1995)). "In analyzing the evidence, it is necessary to draw meaningful inferences and allow reasonable conclusions about the individuals's strengths and weaknesses." SSR 85-16. SSR 85-16 further delineates that "consideration should be given to ... the [q]uality of daily activities ... [and the ability to sustain activities, interests, and relate to others *over a period of time*" and that the "frequency, appropriateness, and independence of the activities must also be considered." SSR 85-16.

---

[5]Claimant testified at the hearing that he has to lie down fifteen times a day, but there is no objective medical evidence substantiating Claimant's need to lie down. <u>See</u> <u>Harris v. Barnhart</u>, 356 F.3d 936, 930 (8th Cir. 2004) (whether there is a need to lie down is a medical question requiring medical evidence; record did not contain any evidence that medical condition required claimant to lie down for hours each day).

An ALJ must begin his assessment of a claimant's RFC with an evaluation of the credibility of the claimant and assessing the claimant's credibility is primarily the ALJ's function. See Anderson v. Barnhart, 344 F.3d 809, 815 (8th Cir. 2003) (finding a claimant's credibility is primarily a matter for the ALJ to decide); Pearsall, 274 F.3d at 1218. In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole. Holstrom v. Massanari, 270 F.3d 715, 721 (8th Cir. 2001) ("The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts."); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). In Polaski, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints. Polaski, 739 F.2d at 1322. The ALJ must make express credibility determinations detailing the inconsistencies in the record that support the discrediting of the claimant's subjective complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). See also Johnson v. Secretary of Health and Human Servs., 872 F.2d 810, 813 (8th Cir. 1989); Ghant v. Bowen, 930 F.2d 633, 637 (8th Cir. 1991). "An ALJ must do more than rely on the mere invocation of Polaski to insure safe passage for his or her decision through the course of appellate review." Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995). However, the Eighth Circuit has held that an ALJ is not required to discuss each Polaski factor methodically. The ALJ's analysis will be accepted as long as the opinion reflects acknowledgment and consideration of the factors before discounting the claimant's subjective complaints. Lowe v. Apfel, 226 F.3d 969, 972 (8th Cir. 2000). See also Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). An ALJ is only required to consider impairments he finds credible and supported by substantial evidence in determining a claimant's RFC. See McGeorge v. Barnhart, 321 F.3d 766, 769 (8th Cir. 2003) ("The ALJ properly limited his RFC

determination to only the impairments and limitations he found to be credible based on his evaluations of the entire record." )

The ALJ's determination of the Claimant's RFC is supported by substantial evidence in the record including Claimant's testimony and the ALJ's observation of Claimant during the hearing. The ALJ listed facts from the record regarding each of the Polaski factors that reflected upon the Claimant's ability to perform sedentary work. The ALJ properly evaluated the medical evidence in the record and opined that the medical evidence diminishes Claimant's credibility. The ALJ noted that at the time of the hearing, Claimant showed exaggerated symptoms inconsistent with the medical findings. The ALJ also noted that observations by the treating physician and objective testing show that Claimant can work. The ALJ also properly considered the Polaski factors in concluding that "claimant lacks credibility in other respects." (Tr. 13). The ALJ listed facts from the record regarding the Polaski factors that reflected upon the Claimant's ability to perform sedentary work such as his daily activities and his magnification of symptoms. Further, the ALJ pointed out other inconsistencies in the record that tended to militate against Claimant's credibility. See Gregg v. Barnhart, 354 F.3d 710, 714 (8th Cir. 2003) (if ALJ explicitly discredits claimant and gives goos reasons for doing so, deference should be given to his credibility determination). Those included the Claimant's current treatment for back pain, his normal daily activities, and the ALJ's observations of Claimant during the hearing. Based on the ALJ's analysis of the medical evidence and the claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that Claimant retains a RFC to perform sedentary work so long as he avoids jobs requiring overhead lifting, walking on uneven surfaces, climbing, lifting from ground level, working around vibration and has the option to sit or

stand every thirty minutes.

Based on the ALJ's analysis of the medical evidence and Claimant's credibility, the undersigned finds that there exists in the record substantial evidence to support a finding that the Claimant retains an RFC to perform sedentary work. The ALJ's determination does not contradict any of the medical evidence, and nothing else in the record detracts from his decision. Notably, Claimant was free to provide evaluations supporting his contentions. See 20 C.F.R. § 404.1512(c) ("Your responsibility.... You must provide evidence showing how your impairment(s) affects your functioning during the time you say that your are disabled, and any other information that we need to decide your case."); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004) ("A disability claimant has the burden to establish [his] RFC.").

The undersigned finds that the ALJ considered Claimant's subjective complaints on the basis of the entire record before him and set out the inconsistencies detracting from Claimant's credibility. The ALJ may disbelieve subjective complaints where there are inconsistencies on the record as a whole. Battles v. Sullivan, 902 F.2d 657, 660 (8th Cir. 1990). The ALJ's credibility determination is supported by substantial evidence on the record as a whole, and thus the Court is bound by the ALJ's determination. Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

B.    <u>Substantial Evidence Supporting the ALJ's Decision</u>

Claimant argues that the ALJ's decision is not supported by substantial evidence on the record as a whole, because the ALJ erred in finding Claimant not disabled inasmuch as his decision is not supported by substantial evidence.  Substantial evidence is less than a preponderance but enough that a reasonable mind might accept as adequate to support the ALJ's conclusions, taking into consideration evidence that detracts from as well as supports those conclusions.  <u>See</u> <u>Cunningham v. Apfel</u>, 222 F.3d 496, 500 (8th Cir. 2000).

Using the five-step analysis detailed in 20 C.F.R. § 404.1520, the ALJ determined that Claimant has not engaged in substantial employment since December 5, 2001.  (Tr. 13, 18).  However, the ALJ found that Claimant did not have an impairment that met or medically equaled an impairment listed in the regulations.  (Tr. 18).  In evaluating whether Claimant could perform past relevant work, the ALJ considered the credibility of Claimant.

The ALJ found that Claimant's subjective complaints that his symptoms completely precluded all substantial gainful activity were inconsistent with the record as a whole and therefore, Claimant's complaints were not credible.  (Tr. 18).  In making a credibility determination, an ALJ may discount subjective complaints if they are inconsistent with the record as a whole.  <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8thCir. 1984).  In <u>Polaski</u>, the Eighth Circuit set out factors for an ALJ to consider when determining the credibility of a claimant's subjective complaints.  The ALJ must consider all of the evidence presented, including Claimant's prior work record and observations by third parties and treating and examining physicians as to:

1.  the claimant's daily activities;

2.  the duration, frequency and intensity of the pain;

3.   any precipitating and aggravating factors;

4.   dosage, effectiveness and side effects of medication; and

5.   any functional restrictions.

Polaski, 739 F.2d at 1322.  The ALJ must make express credibility determinations detailing the

inconsistencies in the record that support the discrediting of the claimant's subjective complaints.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).  See also Johnson v. Secretary of Health and

Human Servs., 872 F.2d 810, 813 (8th Cir. 1989).  "An ALJ must do more than rely on the mere

invocation of Polaski to insure safe passage for his or her decision through the course of appellate

review."  Harris v. Shalala, 45 F.3d 1190, 1193 (8th Cir. 1995).  However, the Eighth Circuit has

held that an ALJ is not required to discuss each Polaski factor methodically.  The ALJ's analysis

will be accepted as long as the opinion reflects acknowledgment and consideration of the factors

before discounting the claimant's subjective complaints.  Lowe v. Apfel, 226 F.3d 969, 972 (8th

Cir. 2000).

The ALJ properly discredited Claimant's subjective complaints of pain.  The ALJ correctly

stated the law regarding a claimant's subjective complaints and specifically listed the Polaski

factors.  The ALJ thoroughly described Claimant's hearing testimony, addressing his complaints

regarding his daily activities; the duration, frequency and intensity of his pain; the precipitating

and aggravating factors; the dosage effectiveness and side effects of his medications; and his

functional restrictions.  The ALJ also thoroughly summarized Claimant's medical records,

including medical evidence that would tend to contradict Claimant's subjective complaints.  In the

summary, the ALJ included the following:

On August 6, 2003, a report from James J. Coyle, M.D., the claimant's treating

spine surgeon, revealed that the claimant was status post lumbar fusion at L5-S1, had completed physical therapy, and was not taking any pain medication. He noted that he felt "pretty good" as long as he was not exerting himself, had no leg pain, did not have a lot of back pain, and was walking a mile a day regularly. On examination, he was nontender on the left side of his back and had mild tenderness over the bone graft site and no neurologic findings in the left lower extremity. His X-rays looked "very good." Dr. Coyle gave the claimant a work release of light duty with no repetitive bending at the waist and no lifting more than 20 pounds.

***

Another report by Dr. Coyle on September 17, 2003, divulged that the claimant noted that he had no leg pain but still had residual back pain with activity. On examination, he flexed to 30 degrees and had a negative straight leg raise test and trace to absent reflexes. Upon X-rays, there was a solid fusion at L5-S1. At this time, Dr. Coyle would restrict the claimant to "permanently lifting no more than 30 pounds and no repetitive bending at the waist of greater than 40 degrees.

***

At the hearing, the claimant showed exaggerated symptoms, which are not inconsistent with the medical findings. The claimant's wife, Monica Burnett, testified and basically said that the claimant does nothing except watch television.

***

The claimant's prior work record has been satisfactory. The observations by the treating physician and objective testing show that the claimant can do work. The claimant testified that he uses two medications for relief of symptoms. An interviewer with the Social Security Administration field office observed that the claimant had difficulty with sitting, but had no difficulty with understanding, concentrating, standing or walking. At the hearing, I observed that the claimant used a cane, stood for 20 minutes, and tilted backwards. The claimant described his daily activities as taking out the trash, going to the post office, shopping, watching television, reading books, using a computer, and driving. Examining orthopedic surgeon Lee described the claimant doing yard work such as raking leaves . The claimant testified to washing dishes. I find that the claimant's and his wife's statement regarding severity, frequency, and duration of the pain is overstated. Therefore, I find that the allegation of inability to work because of the subjective complaints is not credible.

(Tr. 15, 17-18) (internal citations omitted). The ALJ then concluded that "[t]he evidence

persuades me that the claimant has a retained residual functional capacity for work activity at the

sedentary exertional level with a sit or stand option every 30 minutes, no overhead lifting, no walking on uneven surfaces, no climbing, no lifting from ground level, and no work around vibration.  This RFC is supported by the medical evidence of record."  (Tr. 16).

It is well settled that an ALJ must set forth the inconsistencies in the evidence presented and discuss the factors set forth in Polaski when making a credibility determination.  However, the Eighth Circuit has consistently held that an ALJ is not required to methodically discuss each Polaski factor as long as he acknowledged and examined the factors before discounting a claimant's subjective complaints.  Lowe, 226 F.3d at 972.

The ALJ's opinion indicates a thorough review of the record.  The opinion includes relevant facts from Claimant's testimony regarding his daily activities, the duration frequency and intensity of his pain, the precipitating and aggravating factors, the dosage, effectiveness and side effects of his medication, and functional restrictions.  The ALJ's opinion also includes a summary of the objective medical evidence.  However, the ALJ does not specifically address how this evidence supports Claimant's lack of credibility through a methodical discussion of each Polaski factor.  As Lowe instructs, an opinion not discussing in detail each factor is satisfactory so long as the ALJ's opinion reflects an examination and acknowledgment of the factors.  The ALJ's opinion in the case at bar so reflects.

Moreover, evidence exists in the record that reveals inconsistencies between Claimant's subjective complaints and his daily activities; duration, frequency and intensity of his pain; and his functional limitations.  Claimant testified that he takes out the trash, goes to the post office, shops, watches television, reads books, and uses a computer.  Likewise, Claimant reported during the consultative evaluation by Dr. Lee that he does some yard work.  These activities are inconsistent

with Claimant's assertion that he must lie down fifteen times a day. Claimant testified that he can walk only two hundred feet before resting. This complaint is inconsistent with reports he made to Dr. Coyle that he walks at least a mile every day. These inconsistencies support the ALJ's determination that Claimant's complaints are not credible. Even if the ALJ's opinion does not specifically address these inconsistencies within the framework of the <u>Polaski</u> factors, the opinion as a whole reflects that the ALJ conducted a thorough and searching review of the facts and law set before him. "An 'arguable deficiency in opinion-writing technique' does not require [a court] to set aside an administrative finding when that deficiency had no bearing on the outcome." <u>Robinson v. Sullivan</u>, 956 F.2d 836, 841 (8th Cir. 1992) (quoting <u>Benskin v. Bowen</u>, 830 F.2d 878, 883 (8th Cir. 1987)).

Evidence may exist in the record which would support a finding of disability. However, when it is possible to come to two inconsistent conclusions from the evidence and one of the conclusions represents the ALJ's findings, the Court must defer to the agency decision. <u>Robinson</u>, 956 F.2d at 838. The ALJ sits in a better position than a reviewing court to assess a claimant's credibility. <u>Brown v. Chater</u>, 87 F.3d 963, 966 (8th Cir. 1996). Furthermore, the Court will not reverse an agency decision "merely because substantial evidence would have supported an opposite position." <u>Woolf v. Shalala</u>, 3 F.3d 1210, 1213 (8th Cir. 1993) (quoting <u>Baker v. Heckler</u>, 730 F.2d 1147, 1150 (8th Cir. 1984)). Since evidence exists in the record to support the credibility findings of the ALJ, the Court concludes that the ALJ's decision is supported by substantial evidence on the record as a whole. <u>See</u> <u>Dixon v. Barnhart</u>, 353 F.3d 602, 604-05 (8th Cir. 2003) (substantial evidence is evidence that a reasonable person would find adequate to support decision).

C.    <u>Post-Hearing Medical Records</u>

The undersigned finds that the additional medical records, the vocational assessment of Susan Shea, and the letter of counsel submitted by the Claimant do not alter the outcome of this opinion. Indeed, the undersigned notes that these records were part of the record before the Appeals Council prior to the Appeals Council finding no basis for changing the ALJ's decision and denying claimant's request for review of the ALJ's decision. (Tr. 6-9, 402-37). Thus, the undersigned finds that the vocational assessment adds nothing new to the record regarding Claimant's residual functional capacity.

For the foregoing reasons, the ALJ's decision is supported by substantial evidence on the record as a whole. Inasmuch as there is substantial evidence to support the ALJ's decision, this Court may not reverse the decision merely because substantial evidence exists in the record that would have supported a contrary outcome or because another court could have decided the case differently. <u>Gowell v. Apfel</u>, 242 F.3d 793, 796 (8th Cir. 2001). Accordingly, the decision of the ALJ denying Claimant's claims for benefits should be affirmed.

Therefore, for all the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner be affirmed and that Claimant's complaint be dismissed with prejudice.

Dated this <u> 25th </u> day of October, 2006.

 /s/ Terry I. Adelman         
UNITED STATES MAGISTRATE JUDGE
